UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

ANDERSON FEDERATION OF          )
TEACHERS, et al.                )
                                )
            Plaintiffs,         )
                                )
        v.                      )        No. 1:21-cv-01767-SEB-DML
                                )
TODD ROKITA, et al.             )
                                )
            Defendants.         )

**ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

This cause is before the Court on Plaintiffs' Motion for Preliminary Injunction
[Dkt. 2], filed on June 15, 2021.  In this lawsuit, Plaintiffs Anderson Federation of
Teachers, Avon Federation of Teachers, Martinsville Classroom Teachers Association,
G. Randall Harrison, a teacher and the President and dues-paying member of the
Anderson Federation of Teachers, Suzanne Lebo, a teacher and the President and dues-
paying member of the Avon Federation of Teachers, and Shannon Adams, a teacher and
the President and a dues-paying member of the Martinsville Classroom Teachers
Association, (collectively, "Plaintiffs") are challenging Indiana's Senate Enrolled Act 251
("SEA 251"), effective July 1, 2021, and codified at Indiana Code § 20-29-5-6(c)–(d),
which requires teachers and school corporations to comply with new procedures to
authorize the deduction of union dues from teachers' paychecks, on grounds that it
abrogates existing dues authorization agreements in violation of the Contract Clause of

the United States Constitution and violates teachers' First Amendment rights to freedom of association and freedom of speech.

Plaintiffs seek to have Defendant Todd Rokita, in his official capacity as the Attorney General of the State of Indiana ("the State"),[1] enjoined from enforcing SEA 251, pending a decision on the merits of Plaintiffs' claims in this matter.[2]  Plaintiffs' motion was fully briefed on June 28, 2021 and the Court heard oral arguments on the motion the following day, on June 29, 2021.  Having now considered those arguments, the parties' evidentiary and other written submissions, and the controlling principles of law, we hereby <u>GRANT</u> Plaintiffs' Motion for Preliminary Injunction as to their Contract Clause and First Amendment free speech claims and <u>DENY</u> the motion as to the First Amendment association claim.

## **Factual Background**

Plaintiffs are teacher Unions that represent school employees in Indiana and individual teachers represented by those teacher Unions.  The Unions are parties to collective bargaining agreements ("CBAs") with the school corporations that employ the

---

[1] Plaintiffs have also named Katie Jenner, in her official capacity as the Secretary of Education of the State of Indiana, and Tammy Meyer, in her official capacity as the Chair of the Indiana Education Employment Relations Board, as defendants in this action.  At the June 29, 2021 preliminary injunction hearing, counsel for Defendants indicated that the State would be moving to dismiss Ms. Jenner and Ms. Meyer on grounds that neither has enforcement responsibilities in conjunction with SEA 251.  Plaintiffs' counsel interposed no oral objection at the hearing to the filing of such motion.  While Defendants have not yet filed moved to dismiss Ms. Jenner and Ms. Meyer in this litigation, anticipating that such motion will be well-taken, we have not included them in this order.

[2] At the June 29, 2021 hearing, Plaintiffs' counsel limited the scope of the immediate relief Plaintiffs seek to enjoining the State from enforcing SEA 251 as to dues authorizations executed for 2020–2021 school year, at least until the full dues from that year are paid.  Because Plaintiffs' pending motion is not so limited, we address all issues raised therein in this order.

teachers represented by the Unions.  Provisions in these CBAs provide for a system whereby teachers can elect to have Union dues deducted from their paychecks by the school corporations and then transmitted to the teachers' Unions.

## I.      Wage Assignments in Indiana

Dues deductions such as those at issue in this litigation are wage assignments generally governed by Indiana Code § 22-2-6-2.  That provision authorizes an assignment of wages if the assignment is (1) in writing; (2) signed by the employee personally; (3) by its terms revocable at any time by the employee upon written notice to the employer; (4) agreed to in writing by the employer; and (5) for the purpose of paying any of the eighteen (18) types of costs specified in the statute, including as is relevant here, "dues to become owing by the employee to a labor organization of which the employee is a member." *Id.*  Indiana law provides that "[a]ny direction given by an employee to an employer to make a deduction from the wages to be earned by said employee, after said direction is given, shall constitute an assignment of the wages of said employee." IND. CODE § 22-2-6-1(a).  "Employer" in this context "include[s] the state and any political subdivision of the state."  *Id.* § 22-2-6-1(b).

## II.     Indiana Teachers' Dues Authorization Agreements Prior to the Passage of SEA 251

In accordance with these statutes, prior to the passage of SEA 251, the Indiana statutory provision governing Collective Bargaining for Teachers and dues deductions for teachers stated as follows:

(a) the school employer shall, on receipt of the written authorization of a school employee:

       (1) deduct from the pay of the employee any dues designated or certified by the appropriate officer of a school employee organization that is an exclusive representative of any employees of the school employer; and

       (2) remit the dues described in subdivision (1) to the school employee organization.

  (b) Deductions under this section must be consistent with:

       (1) IC 22-2-6; [general wage assignment statute described above]

       (2) IC 22-2-7; [assignment of wages to wage brokers] and

       (3) IC 20-28-9-18 [assignment of wages for insurance or to annuity accounts].

IND. CODE § 20-29-5-6(a)–(b). For many years prior to the recent passage of SEA 251, the Plaintiff Unions, the teachers they represent, and the school corporations which employ those teachers, made arrangements for the payment of Union dues through payroll deduction pursuant to this legal framework. The teachers signed agreements authorizing their School Employer to withhold amounts from their paychecks and to remit those amounts to their Unions to pay their dues; the School Corporations agreed to withhold the amounts and remit them to the Unions; and the Unions agreed to accept dues payments through this payroll deduction system.

     Prior to the passage of SEA 251, the specific language used on the authorization forms completed by Indiana teachers authorizing the deduction of their dues from their paychecks varied among school districts. The following are examples of the language used in Plaintiffs' authorization forms:

     I hereby request the MSD of Martinsville to withhold dues for the Martinsville Classroom Teachers Association (MCTA) in substantially equal installments from my pay in accordance with the collective bargaining agreement. The total of such deductions shall be the amount specified each year by the treasurer of the MCTA, and the proceeds from such deductions are to be forwarded promptly to that officer of the

Association.  I also request that this written authorization remain in effect from year to year unless it is revoked in writing by me.

Pls.' Exh. 1B (Dues Authorization Form for <u>Martinsville</u> Classroom Teachers

Association).

My signature below authorizes the Avon Community School Corporation to deduct dues from my payroll checks for the Avon Federation of Teachers in an amount of and according to a schedule agreed upon by the Avon Federation of Teachers.  Such dues shall then be forwarded to the treasurer of the Avon Local 3519.  My membership and dues will stay in effect until I notify the treasurer in writing otherwise.

Pls.' Exh. 2B (Dues Authorization Form for <u>Avon</u> Federation of Teachers Local 3519).

This is to authorize the Anderson Community School Corporation to withhold from my pay the established dues to the Anderson Federation of Teachers.  <u>It is understood this authorization shall remain in force until notification is made to the school administration and the Anderson Federation of Teachers</u>.

Pls.' Exh. 3B (Dues Authorization Form for <u>Anderson</u> Federation of Teachers Local 519)

(emphasis in original).

The Unions and school corporations agreed to this payroll deduction system in

their CBAs.  The <u>Anderson</u> agreement, for example, provides in relevant part as follows:

The school employer shall, on written authorization of a school employee, deduct from each pay of such employee, starting with the second pay, and each pay thereafter of such employee any dues designated or certified by the appropriate officer of the Union and shall remit such dues to the Union after each deduction.

Pls.' Exh. 3A (Anderson Collective Bargaining Agreement).

The <u>Avon</u> agreement provides in relevant part:

[The] Board agrees to deduct Union membership dues from the salaries of those teachers who have authorized such deductions.  Such authorization shall be provided by the Union and submitted to the Board on or before the

fourth (4th) pay date of the school year.  Such authorization shall continue in effect from year to year unless revoked in writing by the teacher. Additional authorization will be accepted anytime with deductions beginning within four (4) weeks of the submission of the authorization.

\*\*\*

Deductions shall be made in twenty-one (21) equal installments, beginning with the sixth (6th) paycheck in the amount to be determined each October. Total remaining Union dues from non-returning teachers will be deducted accordingly from their last payroll check.  The proceeds from the deductions shall be forwarded by the Board of the Treasurer of the Union within five (5) school days after the checks from which the deduction were made are delivered to the teachers.

Pls.' Exh. 2A (Avon Collective Bargaining Agreement).

Finally, the <u>Martinsville</u> agreement provides in relevant part as follows:

Teachers who authorize dues deductions shall have dues deducted each year at the same rate unless the School Corporation receives written notification from the teacher to cease making such deductions not less than two weeks prior to the first pay of the new school year.  The Association shall certify the amount of the unified dues to the Corporation on or before August 1 of each school year.  The School Corporation shall provide a list of the membership authorizations on file to the Association prior to October 1.  The first deduction will be the first pay of the school year for all continuing members ….

Pls.' Exh. 1A (Martinsville Collective Bargaining Agreement).

## III.    Expiration of Current CBAs and Withholding Authorizations

Each teacher in Indiana executes an individual contract with the school corporation setting forth the number of days they are required to work and the amount they are to be paid for the work.[3]  IND. CODE § 20-28-6-2(a).  This teacher contract is

---

[3] There are, of course, exceptions for specific categories of teachers, but the vast majority of teachers are on standard teacher contracts.  We address in this order only those exceptions that are relevant to the issues before us.

entered into by and between the school corporation and the teacher on an annual basis until the teacher reaches a certain level of seniority and/or accreditation, at which point the contract is presumed to continue from year-to-year and can be cancelled or non-renewed only on a showing of just cause or other enumerated causes. IND. CODE § 20-28-6-8.

The salary in that contract is not set by negotiation between the teacher and the school corporation, but by the CBA entered into between a school corporation and the exclusive representative of its teachers. Under Indiana law, CBAs can extend at most for a two-year period and must terminate at the end of Indiana's state budget biennium. IND. CODE § 20-29-6-4.7. The end of the current budget biennium is June 30, 2021, meaning all CBAs relevant to this litigation expire on that date.

However, pursuant to Indiana Code § 20-29-6-12, bargaining on a CBA cannot commence until September 15 of a given year and must be completed by November 15 of the same year, meaning that, at the start of a school year, the amount a teacher will be paid over the course of that year is uncertain, unless the teacher's pay is governed by the second year of a two-year CBA. Thus, while a teacher begins work under their contract in August or early September, if the teachers' union is successful in negotiating a raise or stipend, the actual amount the teacher will be paid differs from that set forth in the contract. The general practice is to amend teachers' contracts in November of each year following the conclusion of collective bargaining and then pay the teachers retroactively any agreed upon increase resulting from that bargaining.

Many teachers' CBAs in effect throughout the state, including the Avon and Martinsville agreements, provide pay for a given school year across twenty-six (26) biweekly pay periods, from the beginning of the school year in August of one year to the beginning of the school year in August of the next.[4]  This means that, even though the Avon and Martinsville CBAs expire on June 30, 2021, the school corporations' contractual obligation to pay salary and the contractual rights of the approximately 550 teachers in those districts to receive salary both extend beyond that date into August 2021, when the final biweekly payment is made.  Likewise, under the current dues withdrawal agreements, the school corporations' corresponding contractual obligation to deduct dues from the teachers' paychecks and remit those dues to the Unions extends beyond June 30, 2021 into August 2021, as does the Unions' right to receive those dues.

## IV.   SEA 251

During the 2021 legislative session, the Indiana legislature passed SEA 251 which amended Indiana Code § 20-29-5-6 by adding the following language:

(c) After June 30, 2021, the following apply to a deduction authorization by a school employee under subsection (a) or when a school employer agrees with a school employee organization to deduct school organization dues from a school employee's pay:

(1) A school employee has the right to resign from, and end any financial obligation to, a school employee organization at any time. The right described in this subdivision may not be waived by the school employee.

---

[4] Other American Federation of Teachers Indiana locals that have 26 biweekly pay periods include teachers at the School City of Hammond, the Community School Corporation of Southern Hancock County, the Lawrenceburg Community School Corporation, and Lake Ridge Schools.

(2) The authorization for withholding form shall include the school employee's full name, position, school employee organization, and signature and shall be submitted directly to the school employer by the school employee.  After receiving the authorization for withholding form, the school employer shall confirm the authorization by sending an electronic mail message to the school employee at the school employee's school provided work electronic mail address and shall wait for confirmation of the authorization before starting any deduction.  If the school employee does not possess a school provided work electronic mail address, the school employer may use other means it deems appropriate to confirm the authorization.

(3) An authorization for school employee organization dues to be deducted from school employee pay shall be on a form prescribed by the attorney general, in consultation with the board, and shall contain a statement in 14 point type boldface font reading: "I am aware that I have a First Amendment right, as recognized by the United States Supreme Court, to refrain from joining and paying dues to a union (school employee organization).  I further realize that membership and payment of dues are voluntary and that I may not be discriminated against for my refusal to join or financially support a union.  I authorize my employer to deduct union dues from my salary in the amounts specified in accordance with my union's bylaws.  I understand that I may revoke this authorization at any time."

(4) Authorizations by a school employee for the withholding of school employee organization dues from the school employee's pay shall not exceed one (1) year in duration and shall be subject to annual renewal.  Any authorization submitted by a school employee to the school employer before July 1, 2021, expires on July 1, 2021, and must be resubmitted in accordance with this subsection.

(5) Upon the submission of a written or electronic mail request to a school employer, a school employee shall have the right to cease the withholding of school employee organization dues from their pay. Upon receipt of a request, the school employer shall:

> (A) cease the withholding of school employee organization dues from the school employee's pay beginning on the first day of the employee's next pay period; and

(B) provide written or electronic mail notification of the school employee's decision to the school employee organization.

The notification in clause (B) must occur within a reasonable time to ensure that the school employee is not required to have dues withheld during the school employee's next pay period or any subsequent pay period.

(6) A school employer shall annually provide, at a time the school employer prescribes, written or electronic mail notification to its school employees of their right to cease payment of school employee organization dues and to withdraw from that organization. The notification must also include the following:

(A) The authorization form described in subsection (c)(3).

(B) The amount of dues that the school employee will be liable to pay to the school organization during the duration of the authorization, if the employee does not revoke the authorization before it expires.

(d) On or before July 1, 2021, and not later than July 30 of each year thereafter, the attorney general, in consultation with the board and the department, must notify all school employers of the provisions described in subsection (c). This notice must include the authorization form described in subsection (c)(3).

IND. CODE § 20-29-5-6(c)–(d).

The provisions set forth in SEA 251 apply only to teachers and no other public employees in Indiana and apply only when a teacher authorizes a payroll deduction to pay Union dues, not when they effectuate a wage assignment for any of the other seventeen costs enumerated in Indiana Code § 22-2-6-2.

**V.      The Instant Lawsuit**

Plaintiffs filed their complaint and contemporaneously moved for preliminary injunctive relief on June 15, 2021, (we pause to note: a mere 15 days before the operative deadline) on grounds that SEA 251 nullifies the existing dues authorization contractual agreements between teachers, Indiana's school corporations, and the teachers' union representatives, in violation of the Contract Clause, and impermissibly singles out teachers' unions and the school employees that they represent, in violation of the teachers' First Amendment rights to freedom of association and freedom of speech.  Plaintiffs' motion for a preliminary injunction was fully briefed on June 28, 2021, two days before the effective date of SEA 251, and the Court heard argument on the motion the following day, on June 29, 2021.

## Legal Analysis

### I.      Preliminary Injunction Standard

To obtain a preliminary injunction, the moving party must demonstrate: (1) a reasonable likelihood of success on the merits; (2) no adequate remedy at law; (3) irreparable harm absent the injunction.  *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012).  If the moving party fails to demonstrate any one of these three threshold requirements, the injunctive relief must be denied.  *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) (citing *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)).  If these threshold conditions are met, the Court must then assess the balance of the harm—the harm to Plaintiffs, if the injunction is not issued, against the harm to the State, if it is issued—and determine the effect of an injunction on the public

interest. *Girl Scouts*, 549 F.3d at 1086. "The more likely it is that [the moving party] will win [their] case on the merits, the less the balance of harms need weigh in [their] favor." *Id.* at 1100.

## II.  Likelihood of Success on the Merits

### A. Contract Clause

Plaintiffs argue that SEA 251 violates the Contract Clause of the U.S. Constitution because it terminates existing dues deduction authorizations that, but for the passage of SEA 251, would continue throughout the remaining pay periods of the 2020–2021 school year, which, for schools on twenty-six pay periods, including Avon and Martinsville, extend beyond June 30, 2021 into the first week of August 2021. Plaintiffs concede, however, that applying SEA 251 to future dues deduction authorizations has no Contract Clause implications. Accordingly, our Contract Clause analysis applies only to those existing dues deduction authorizations for the remaining pay periods of the 2020–2021 school year.

The Contract Clause prohibits states from passing laws "impairing the Obligation of Contracts." Art. I, § 10, cl. 1. "The prohibition is not absolute, but it imposes substantial limits on laws that would undermine existing contractual rights." *Elliott v. Bd. of Sch. Trustees of Madison Consol. Schs.*, 876 F.3d 926, 928 (7th Cir. 2017). To determine whether a statute violates this clause, courts apply "a two-step analysis, asking first whether a change in state law has substantially impaired a contractual relationship, and second, whether the impairment is reasonable and necessary for a legitimate public purpose. *Id.* at 932 (internal citations omitted). We apply this analysis below.

### 1. Substantial Impairment

Here, SEA 251 provides in relevant part that "[a]ny authorization submitted by a school employee to the school employer before July 1, 2021, expires on July 1, 2021, and must be resubmitted in accordance with this subsection."  IND. CODE § 20-29-5-6(c)(4). However, as discussed in more detail above, existing dues deduction authorizations in schools on twenty-six pay periods, including, *inter alia*, Martinsville and Avon, require dues to be deducted through the first week of August 2021 for the prior school year. Accordingly, SEA 251 by its explicit terms cancels these existing dues authorizations as of July 1, 2021, which, we hold, the Plaintiffs are likely to establish as a clear impairment of their contracts, in that it terminates the contractual relationships altogether.

We find that Plaintiffs are also likely to establish that such impairment is substantial.  "Legislation causes a substantial impairment if it alters a 'central undertaking' of the contract that 'substantially induced' a party to enter the bargain." *Elliott*, 876 F.3d at 934.  "In other words, an impairment is substantial if it disrupts actual and important reliance interests" and the parties did not anticipate or foresee the change in the law. *Id.* at 935.

Here, current dues authorization agreements authorize the deductions of dues on a continuing basis until revoked by the teacher.  Accordingly, Plaintiffs are likely to be able to establish that SEA 251, which completely abrogates existing authorization agreements effective July 1, 2021, alters the "central undertaking" of those agreements, given that the statute clearly disrupts these teachers' expectations that their automatic Union dues deductions would continue unabated until they took action to revoke such authorization.

13

*See Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 245 (1978) (stating that contracts "enable individuals to order their personal and business affairs," and once agreed upon, "those rights and obligations are binding under the law, and the parties are entitled to rely on them.").  Prior to the passage of SEA 251, the procedures followed for teachers to authorize union dues deduction had been used for decades—seemingly without incident.  Thus, Plaintiffs are also likely to show that the parties to the existing dues deduction authorization agreements did not have reason to anticipate or foresee the change in the law affecting union dues wage assignments, particularly that such change would apply retroactively to terminate their existing agreements.

The State argues that Plaintiffs cannot show that the existing dues authorizations are substantially impaired by SEA 251 because Plaintiffs can reverse the statute's effect merely by completing the new State-mandated authorization form.  The State asserts that SEA 251 is thus analogous to the Minnesota statute upheld by the Supreme Court in *Sveen v. Melin*, 138 S.Ct. 1815 (2018), which provided that, upon dissolution of a marriage, a designation of the former spouse in a life insurance policy was automatically revoked.  The law was enacted after Mr. Sveen purchased a life insurance policy and named his then-wife as the beneficiary.  After their divorce, Mr. Sveen took no action to alter his beneficiary designation.  *Id.* at 1821.  Upon his death, his ex-wife and children made claims against his life insurance policy, with his children arguing that their father's divorce canceled his ex-wife's beneficiary designation and his ex-wife arguing that because the law did not exist when the policy was purchased and she was named as the

primary beneficiary, applying the later-enacted law to the policy violated the Contract Clause. *Id.*

In *Sveen*, the Supreme Court held that even though the law made "a significant change," the revocation statute did not "severely impair" the pre-existing contract in part because "a policy holder can reverse the effect of the Minnesota statute with the stroke of a pen. The law puts in place a presumption about what an insured wants after divorcing. But if the presumption is wrong, the insured may overthrow it. And he may do so by the simple act of sending a change-of-beneficiary form to his insurer." *Id.* at 1823. "The statute thus reduces to a paperwork requirement (and a fairly painless one, at that): File a form and the statutory default rule gives way to the original beneficiary designation." *Id.* The *Sveen* Court observed that, in cases going back as far as the 1800s, Supreme Court jurisprudence has held that laws imposing minimal paperwork burdens like the Minnesota statute do not violate the Contract Clause. *Id.* at 1823–24.

Relying on the reasoning and holding in *Sveen*, the State argues that the effect of SEA 251 on existing dues deduction authorization agreements can likewise be undone simply by completing and submitting the new withholding authorization form and cannot therefore be found to substantially impair those contracts. However, because we find, for the reasons detailed below, *Sveen* is distinguishable from the circumstances presented here, it does not alter our conclusion that Plaintiffs have shown a likelihood of establishing that SEA 251 substantially impairs their existing dues withholding authorizations.

First, the Supreme Court in *Sveen* relied on the fact that the Minnesota statute furthered the insurance policyholder's intent in the typical case, given that most divorcees "do not aspire to enrich their former partners." *Id.* at 1822.  Accordingly, the Court concluded that the statute "often honors, not undermines, the intent of the only contracting party to care about the beneficiary term." *Id.* at 1823.  In contrast, here, SEA 251 clearly undermines the intent of the contracting parties when applied retroactively to existing dues deduction authorization agreements that were intended to remain in effect until revoked by the teacher.

Second, the Court found that the Minnesota law was "unlikely to upset a policyholder's expectations at the time of contracting" because "an insured cannot reasonably rely on a beneficiary designation remaining in place after a divorce." *Id.* However, in the case at bar, the expectations of the parties to the existing withholding agreements at the time of contracting were that the authorizations would remain in effect each year unless revoked by the teacher.  As discussed above, prior to the passage of SEA 251, the dues deduction authorization procedures applicable to teachers had been used for many years with no apparent problems.  Thus, we hold that Plaintiffs are likely to be able to show that the parties to those existing contracts reasonably could have relied on the wage assignments remaining in effect, at the very least through the end of the 2020–2021 school year.

Third, as discussed above, the Court relied on the fact that the Minnesota statute imposed only a minimal paperwork burden of the type long found by courts not to violate the Contract Clause.  The State relies most heavily on this portion of the Court's analysis

to support its contention that Plaintiffs cannot show that SEA 251 imposes any substantial impairment here.  While we agree that, under other circumstances, the paperwork burden imposed by SEA 251 might be characterized as modest, Plaintiffs have demonstrated a likelihood of establishing that, when applied retroactively to the existing dues withholding agreements here, it is a quite onerous, if not impossible, burden.

Initially, we note that compliance with SEA 251 involves much more than a simple signature.  Rather, SEA 251 requires that school corporations disseminate a new authorization form to each of its teachers, which must be signed and returned, after which the school must contact each teacher a second time to confirm the authorization, before implementing whatever procedures are necessary to effectuate the payroll deduction. Given that the State did not release the new authorization forms until June 25, 2021, five days before SEA 251 is to go into effect, in the middle of summer break when teachers are likely less accessible, we find that Plaintiffs have shown at least some likelihood of establishing that, under these circumstances, SEA 251 imposes a significant burden as applied to the existing withholding agreements.  This extremely condensed timeline within which to comply to avoid contract termination is in contrast to the cases discussed in *Sveen*, particularly the recording statute addressed in *Vance v. Vance*, 108 U.S. 514 (1883), which *Sveen* noted was upheld under the Contract Clause because it demanded nothing more than a "public registration" and provided "several months" within which to comply with its registration requirement.  138 S.Ct. at 1824.

Accordingly, while we acknowledge the line of cases cited by the State that hold that statutes imposing minimal paperwork burdens do not violate the Contracts Clause,

17

based on the distinctions between *Sveen* and the facts presented here and for all the reasons detailed above, we find that Plaintiffs have shown a likelihood of establishing that SEA 251, when applied to the existing dues deduction authorization agreements, imposes a significant burden that substantially impairs those contracts.

### 2. Reasonable and Necessary to Serve Legitimate Public Purpose

Having found that Plaintiffs have shown a likelihood of establishing that SEA 251 substantially impairs existing dues deduction authorization agreements, we must next determine whether that impairment "is both reasonable and necessary for an important public purpose …." *Elliott*, 876 F.3d at 936. If so, "then the law does not violate the Contract Clause." *Id.*

Here, the State's stated purpose for SEA 251 is to assure that public school teachers provide written consent each year to withhold part of their pay for union dues and to ensure that those withholding agreements do not violate their individual liberties by informing teachers of their right not to join a union and to be free from discrimination based on such a choice. The State argues that requiring updated signatures and withholding agreements each year is a reasonable way to advance these legitimate public purposes.

Assuming arguendo that these are important public purposes, they do not justify retroactive impairment of existing withholding agreements where the obligations under those agreements for the 2020–2021 school year extend for little more than one month after SEA 251 becomes effective and no evidence has been adduced to show that the

affected teachers are unaware, either that those agreements are revocable by them, or of their rights not to join a union and to be free from discrimination based on such a choice. Under such circumstances, Plaintiffs are likely to be able to show that there is not a need for Indiana to impose retroactive impairment of existing dues withholding agreements to achieve its stated purposes. *Cf. Elliott*, 876 F.3d at 938 ("Indiana has not shown it needs to impose this retroactive impairment of its earlier promises of job security to improve teacher quality.").

Moreover, while requiring teachers to sign updated withholding authorizations might in some circumstances be a reasonable method of advancing the State's interests, Plaintiffs are likely to show that, as applied to the existing agreements, requiring such procedures is not reasonable. As discussed above, SEA 251 requires much more than a simple signature. Rather, compliance with SEA 251 requires that school corporations disseminate new authorization forms to each of their teachers, which must then by signed and returned by the teacher, after which the school must contact each teacher a second time to confirm the authorization, all before implementing whatever procedures are necessary to effectuate the payroll deduction. Given that the State did not release the new authorization forms until June 25, 2021, five days before SEA 251 is to go into effect, in the middle of summer break when teachers are likely less accessible, Plaintiffs have established they have a likelihood of showing that SEA 251's retroactive impairment of the existing dues deduction agreements is not reasonable when applied under such circumstances.

For the foregoing reasons, we find that Plaintiffs have shown a likelihood of success on the merits of their Contract Clause claim.

### B. First Amendment Freedom of Association

Plaintiffs next argue that SEA 251 violates teachers' First Amendment right to freedom of association because only teachers face the annual requirement to reauthorize dues deductions and it is only the payment of membership dues, as opposed to any of the other seventeen types of wage assignments permitted in Indiana's Wage Assignment statute, that is subject to SEA 251's requirements. For the reasons detailed below, we hold that Plaintiffs have not shown a likelihood of success on the merits of this claim.

As Defendants argue, the legislation at issue here is similar to legislation upheld by the Seventh Circuit in *Wisconsin Education Association Council v. Walker*, 705 F.3d 640 (7th Cir. 2013), in the face of a First Amendment free speech challenge. In *Walker*, the challenged legislation created two distinct classes of public employees—a select group of "public safety employees" with the remainder classified as "general employees"—and, among other things, prohibited the employers of general employees from deducting union dues from paychecks altogether. *Id.* at 642. There, the Seventh Circuit held that it was well-established that "use of the state's payroll systems to collect union dues is a state subsidy of speech that requires only viewpoint neutrality." *Id.* at 645 (citing *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358–59 (2009) (upholding legislation prohibiting payroll dues deduction applicable to unions representing all public employees).

The *Walker* plaintiffs argued that, because the legislation at issue actively imposed burdens on the speech of unions representing general employees that it did not place on unions representing public safety employees and did so for a political purpose, it was distinguishable from the legislation upheld in *Ysursa*.  The Seventh Circuit rejected this argument on grounds that the *Walker* legislation "erect[ed] no barrier to speech, and speaker-based discrimination is permissible when the state subsidizes speech," 705 F.3d at 646, as long as the subsidy does not "discriminate on the basis of ideas." *Id.* (quoting *Leathers v. Medlock*, 499 U.S. 439, 450 (1991)).

Plaintiffs here argue that *Walker* and *Ysursa* are distinguishable because, unlike the case at bar, they dealt with First Amendment free speech rights, not the right of association.  However, in *South Carolina Education Association v. Campbell*, 883 F.2d 1251 (1989), a case cited favorably in *Walker*, the Fourth Circuit held that South Carolina legislation allowing payroll deductions for charitable organizations, but not for labor organizations or any entity which forwarded the proceeds of payroll deductions to a labor organization, was not violative of the plaintiffs' First Amendment right of association. The plaintiffs in *Campbell* argued that the challenged statute was designed "specifically to deny the [union] payroll deduction benefits and thereby impair the effectiveness of the association." *Id.* at 1252.

The court rejected this argument, holding that, "[w]hile we acknowledge that the First Amendment guarantees the right of association and the right of a professional association to express any ideas and to engage in advocacy on behalf of its members, the First Amendment does not impose an affirmative obligation on the state to assist the

program of the association by providing payroll deduction services." *Id.* at 1257.

Although the Fourth Circuit acknowledged that loss of payroll deductions "may tend to

impair the effectiveness of the [union] in representing its members," such an impairment

is not violative of the First Amendment because "[t]he state's failure to authorize payroll

deductions for the [union] does not deny [the union's] members the right to associate, to

speak, to publish, to recruit members, or to otherwise express and disseminate their

views." *Id.*

 Given this case law, we cannot conclude that Plaintiffs are likely to succeed on

their claim that the additional burdens imposed on them by SEA 251 violate their First

Amendment right to freely associate.

### C.  First Amendment Free Speech

 Finally, Plaintiffs argue that, by requiring teachers to acknowledge their

understanding that they have a right not to join a union and to be free from discrimination

based on such a choice, SEA 251 compels them to speak a prescribed message mandated

by the State which violates their free speech rights under the First Amendment.

 As previously explained, section (c)(3) of SEA 251 requires the State's new dues

deduction authorization agreement to include verbatim the following language in bold

face 14 point font (as shown here): **"I am aware that I have a First Amendment**

**right, as recognized by the United States Supreme Court, to refrain from**

**joining and paying dues to a union (school employee organization). I further**

**realize that membership and payment of dues are voluntary and that I may**

**not be discriminated against for my refusal to join or financially support a union."**

By requiring teachers to sign dues deduction authorization forms with this language, Plaintiffs contend that "SEA 251 violates their First Amendment right to freedom of speech by compelling them to adopt and speak a message dictated by the state." Pls.' Mem. at 17.

It is axiomatic that the First Amendment "guards the individual's right to speak his own mind." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 634 (1943); *see also Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371 (2018) ("The First Amendment . . . prohibits laws that abridge the freedom of speech."). Pursuant to this First Amendment protection, states cannot "compel [the individual] to utter what is not in his mind." *Barnette*, 319 U.S. at 634.[5]

---

[5] The State contends that "speech constitutes unconstitutional compelled speech when a state requires an individual to express a political or ideological message with which the individual disagrees." Defs.' Resp. at 11. Though cases involving disputes over compelled speech are frequently brought by speakers who disagree with a mandated political or ideological message, the State has not directed us to any cases supporting its contention that speech can *only* be considered unconstitutional compelled speech if the speaker disagrees with it on political or ideological grounds. Moreover, we do not infer from the case law such a narrow view of what constitutes unconstitutional compelled speech. *See Barnette*, 319 U.S. at 634–35 (explaining that the issue did not "turn on one's possession of particular [] views or the sincerity with which they are held," given that "many citizens who do not share these [] views hold such a compulsory rite to infringe constitutional liberty of the individual."). We note as well that though the State maintains that the provision at issue is simply a factual assertion, Plaintiffs do, in fact, maintain that it is ideologically charged and underinclusive, and therefore, objectionable. *See* n.8 *supra*. The State also defends SEA 251 on the grounds that it does not require the teachers to express a message in a public forum and is therefore constitutionally sound. This contention is similarly offered without any supporting authorities. That the speech does not occur in a public forum does not alter our analysis.

When enforcing the First Amendment's prohibition on government interference with speech, we often begin by asking whether a regulation is content-based or content-neutral. *Becerra*, 138 S.Ct. at 2371. Content-based regulations "target speech based on its communicative content." *Id.* (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015)). Such regulations "are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Becerra*, 138 S. Ct. at 2371.

In this case, Plaintiffs contend that SEA 251 is a content-based regulation of speech and therefore subject to strict scrutiny. Indeed, regulations which compel "individuals to speak a particular message" "alter the content of their speech" and are, consequently, considered content-based. *Becerra*, 138 S. Ct. at 2371 (*quoting Riley v. Nat'l Fed. of Blind of N.C., Inc*., 487 U.S. 781, 795 (1988)). Accordingly, Plaintiffs request that we apply strict scrutiny when analyzing the constitutionality of SEA 251's mandated language.

The State, on the other hand, likens the requirement prescribed in SEA 251 to state-mandated disclosures regularly required of commercial enterprises for the purpose of preventing the deception of consumers. Such disclosures are subject to a "more deferential standard of review," even if they would otherwise be considered content-based.[6] *Becerra*, 138 S. Ct. at 2372 (collecting cases). The State relies on the Supreme

---

[6] The State also compares SEA 251 to mandatory disclosures aimed at obtaining informed consent in the context of abortion services, which are constitutional so long as they are truthful and non-misleading. *Planned Parenthood of Southeastern Pennsylvania v. Casey* 505 U.S. 833, 881 (1992) (plurality opinion). The provision at issue here, however, is not related to the

Court's decision in *Zauderer v. Office of Disciplinary Counsel* for this position. 471 U.S. 626, 650–653 (1985).  There, the Court upheld Ohio's rule requiring attorneys who advertised their services on a contingency-fee basis to disclose that clients may nonetheless be required to pay some costs and fees. Because such requirements governed commercial advertising and required the disclosure of "purely factual and uncontroversial information about the terms under which  . . . services will be available," the Court held that they should be upheld so long as they were not "unjustified or unduly burdensome." *Id*. at 651.

Even if the deferential standard articulated in *Zauderer* is applicable here, and even if we were to deem the messaging to be "purely factual and uncontroversial,"[7] the State's position fails. *See Becerra*, 138 S.Ct. at 2377 (stating that it need not definitively determine whether *Zauderer* or some level of heightened scrutiny applied to mandated state notices because the notices were unconstitutional even under the more deferential *Zauderer* standard).  Under *Zauderer*, a disclosure requirement cannot be "unjustified or unduly burdensome." *Becerra*, 138 S.Ct. at 2377 (quoting *Zauderer*, 471 U.S. at 651). In addition, such disclosures must "remedy a harm that is potentially real not purely hypothetical." *Becerra*, 138 S. Ct. at 2377 (collecting cases) (internal quotations omitted). Importantly, the State "has the burden of prov[ing] that the disclosure in neither

---

facilitation of informed consent in connection with a medical procedure (specifically, abortion services). *Casey* is thus inapplicable. *Becerra*, 138 S. Ct. at 2374.

[7] We note that Plaintiffs insist that the mandated language is not "uncontroversial."

unjustified nor unduly burdensome." *Id.* (*citing Ibanez v. Florida Dept. of Business and Professional Regulation, Bd. of Accountancy*, 512 U.S. 136, 146 (1994)).

Here, the State has not demonstrated any justification for SEA 251 that is not purely hypothetical. The sole justification that the State puts forward is "assur[ing] that [] public employees understand that they have a right to choose whether or not to join a union without risk to their employment." Defs.' Br. at 10. However, the State has not identified any basis for its apparent belief that teachers do not already know these rights. *Becerra*, 138 S.Ct. at 2377 (holding that requirement that facilities offering resources to pregnant women issue notices to these women that the state had not licensed the facilities to provide medical services failed under *Zauderer* because the state "point[ed] to nothing suggesting" that the women did not already know this information). The State simply offers no non-hypothetical "justification that this provision plausibly furthers." *Becerra*, 138 S.Ct. at 2377. The language requirement contained in SEA 251 therefore does not satisfy *Zauderer,* assuming that standard applies.[8] Accordingly, at this preliminary stage,

---

[8] Applying a heightened standard of scrutiny obviously does not allow the State to fare any better. Even under intermediate scrutiny, SEA 251 is problematic. *Becerra*, 138 S.Ct. at 2375 (explaining that the court need not determine whether content-based regulations of professional speech could escape strict scrutiny because the compelled speech was problematic even under intermediate scrutiny). As stated, the State's purported interest justifying this provision is to "assure[] that public employees have a right to choose whether or not to join a union without risk to their employment." Defs.' Resp. at 10. "Assuming this is a substantial interest, [SEA 251] is not sufficiently drawn to achieve it." *Id.* If the State's goal is to inform public employees of such rights so that they may make informed decisions as to whether to join a union, SEA 251 is "wildly underinclusive." *Id.* (*quoting Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011)). SEA 251 does *not* inform its audience members that they also have a right to join a union without risk to their employment. This right is excluded without any explanation. "Such underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or right." *Id.* (internal punctuation omitted).

we hold that Plaintiffs are likely to prevail on the merits of the question whether section (c)(3) of SEA 251 is violative of the First Amendment.[9]

We briefly address the remaining arguments proffered by the State in defense of section (c)(3). In addition to comparing this provision to those regulations governing commercial speech, the State also contends that SEA 251 is similar to regulations requiring that certain public employees or individuals seeking professional licenses execute oaths, for example, promising to uphold or defend the Constitution of the United States. Such oath requirements have long been upheld, explains the State.

It is true that oaths can be required of public employees or those individuals seeking to obtain professional licensure from the State. *See, e.g., Cole v. Richardson*, 405 U.S. 676 (1972); *Connell v. Higginbotham*, 403 U.S. 207 (1971); *Knight v. Board of Regents*, 269 F. Supp. 339 (S.D.N.Y. 1967) (three-judge court), *aff'd*, 390 U.S. 36 (1968). However, we do not find this line of cases to be instructive here. This is simply not an instance, for example, where a state employee was required to take an oath promising not to overthrow the government by whom he was employed as a public servant, nor is it an instance where a public employee was required to swear an oath to uphold and defend the Constitution of the United States and the Constitution of his or her

---

[9] Even if the State had identified a non-hypothetical justification for SEA 251, the provision "covers a curiously narrow subset of speakers." *Becerra*, 138 S.Ct. at 2378. It applies only to teachers; no other category of worker is required to adopt and accept a government-scripted provision advising of one's right not to join a union. We are directed to be "deeply skeptical" of such distinctions between speakers in this context. *See Becerra*, 138 S.Ct. at 2378 (collecting cases). The State has proffered no plausible reason for why it compels speech from certain speakers but not others.

state. *See id.* While it is well-settled that such mandated oaths are non-controversial in public employment settings, the State offers us no explanation as to how this principle is applicable to the one-sided and unjustified language mandated by section (c)(3).

Finally, the State notes that there are "practical alternatives" available to teachers who wish to pay their union dues without adopting the State's message. For example, teachers could pay their dues by writing a check or authorizing a bank account withdrawal. The State reminds us that the teachers are not constitutionally entitled to deduct their union dues from their pay. *See Ysursa*, 555 U.S. at 355; *see also Walker*, 705 F.3d at 645–46. For these reasons, the State argues that requiring teachers to sign off on SEA 251's declaration as a condition precedent for withholding a portion of their pay for union dues is not unconstitutional compelled speech.

We are unpersuaded by this argument. It is true that teachers do have alternatives available to them; however, the State has once again failed to direct us to any case law supporting the contention that the availability of such alternatives is a relevant part of our constitutional analysis. In addition, though the use of a payroll deduction is considered a benefit, "the government may not deny a benefit to a person because he exercised a constitutional right." *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 545 (1983). The State is therefore "plainly mistaken" that, because the payroll deduction is a benefit, its denial thereof to those who engage in First Amendment protected activities is not constitutionally problematic. *Speiser v. Randall*, 357 U.S. 513, 518 (1958). Here, the State proposes denying the benefit of the payroll deductions to those teachers who wish to invoke their First Amendment right not to speak. This does

not pass constitutional muster. *Compare Regan*, 461 U.S. at 545 (holding that the Internal Revenue Code's prohibition on granting 501(c)(3) status to organizations engaged in substantial lobbying activities was constitutional given that these organization could claim tax exemptions for their non-lobbying activities, and thus the prohibition reflected Congress's decision not to subsidize the lobbying activities rather than a denial of a benefit because of the organization's engagement in lobbying activities) *with Speiser*, 357 U.S. at 518–19 (striking down California's law that anyone seeking to obtain a property tax exemption was required to sign a declaration stating the he or she did not advocate for the forcible overthrow of the government because it effectively penalized claimants for engaging in First Amendment protected activities).

For these reasons, we hold that Plaintiffs have established a likelihood of success on the merits of their claim that section (c)(3) of SEA 251 violates their First Amendment freedom of speech rights.

### III.    Irreparable Harm and Inadequate Remedy at Law

In addition to showing that they have a likelihood of success on the merits of their claims, Plaintiffs are also required to show that, absent injunctive relief, they will suffer irreparable injury for which there is no adequate remedy at law.  Here, as set forth above, Plaintiffs have shown a likelihood of success on the merits of their Contract Clause and First Amendment free speech claims.

It is well-established that "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm…."  *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978); *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 867 (7th Cir.

2006) (holding that likelihood of success on First Amendment violation presumed to constitute irreparable injury); *Connecticut State Police Union v. Rovella*, 494 F. Supp. 3d 210, 220 (D. Conn. 2020) ("It is generally held that an alleged deprivation of constitutional rights—including rights violated under the Contracts Clause—raises 'a presumption of irreparable harm.'"); *Donohue v. Mangano*, 886 F. Supp. 2d 126, 150 (E.D.N.Y. 2012) (stating that a deprivation of constitutional rights "is not just limited to violations of free speech or due process, but may include violations of the Contract Clause as well"). Accordingly, we hold that Plaintiffs have made the necessary showing of irreparable harm.

Moreover, courts recognize that demonstrating irreparable harm is "probably the most common method of demonstrating that there is no adequate legal remedy." 11A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure* § 2944 (2d ed. 1995). Such is the case here. Because the constitutional harm Plaintiffs would suffer in this case absent injunctive relief could not be fully compensated through a monetary award or other legal remedy, we find that Plaintiffs have also established that no adequate remedy at law is available to them.

## IV.   Balance of Harms and the Public Interest

Having concluded that, absent a preliminary injunction, Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law, we turn to the balance of harms and the public interest. These factors merge when, as in this case, the government is the defendant. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Here, as Plaintiffs argue, their threatened constitutional injuries are both tangible and immediate. If the

30

unconstitutional provisions of SEA 251 are implemented, Plaintiffs' First Amendment

right to freedom of speech will be abridged as well as the constitutionally protected

contract right of the parties to the existing dues deduction authorization agreements to

continue paying and collecting Union dues through the 26th pay period of the 2020–2021

school year.  Given the compressed timeline created by the State's failure to distribute

new authorization forms until June 25, 2021, it is almost certain that Plaintiffs will also

suffer interruptions in timely dues deductions, which affects access to union-related

services under their CBAs.

The State, on the other hand, argues that, if Plaintiffs are granted injunctive relief,

their significant interests in certainty headed into the new school year with students,

teachers, school corporations, and others; in labor peace and public employee union

withholdings; and in protecting and upholding individual liberties regarding freedom of

speech and association by providing consent, with employees of a political subdivision of

the State, will be harmed.  The State further argues that an injunction would undermine

both its and the legislature's credibility, as well as the public's confidence in their work,

and would bypass and disrupt the ordinary functions of due process.  While these are no

doubt important state interests, as important as such interests may be, the State cannot

advance such interests by enacting statutes in derogation of the rights of the

constitutionally protected group.  Moreover, the Court is not persuaded that any such dire

harms to the State will actually come to pass, given the narrow scope of the injunction

authorized here, which will prevent the State only from enforcing SEA 251 to terminate a

limited number of existing dues deduction authorization agreements with obligations

31

extending through the first week of August 2021 and from including in its new authorization forms compelled speech that Plaintiffs are likely to succeed in showing is violative of their First Amendment free speech rights.

In sum, given that Plaintiffs have shown a likelihood of prevailing on the merits of its Contract Clause and First Amendment free speech claims, we hold that the balancing of the harms and the public interest favor the issuance of a preliminary injunction "properly tailored" to invalidate only those provisions of SEA 251 on which Plaintiffs have demonstrated their entitlement to such relief. *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 548–49 (7th Cir. 2020).

## V.    Bond

Finally, "Rule 65(c) makes the effectiveness of a preliminary injunction contingent on [a] bond having been posted." *BankDirect Capital Fin., LLC v. Capital Premium Fin., Inc.*, 912 F.3d 1054, 1057 (7th Cir. 2019). However, the Seventh Circuit recognizes that "[u]nder appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)." *Wayne Chem. Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977) (citations omitted). Given that the State is not facing any particular monetary injury as a result of the issuance of the preliminary injunction, we hold that, due to the nature and effect of the preliminary injunction, no bond is required here. *See Habitat Educ. Ctr. v. United States Forest Serv.*, 607 F.3d 453, 458 (7th Cir. 2010) (recognizing there is no reason to require a bond in cases in which "the court is satisfied that there's no danger that the opposing party will incur any damages from the injunction"). The parties have not argued otherwise.

## **Conclusion**

For the reasons detailed above, Plaintiffs' Motion for Preliminary Injunction is

<u>GRANTED</u> as to Plaintiffs' Contract Clause and First Amendment free speech claims and

<u>DENIED</u> as to Plaintiffs' First Amendment freedom of association claim.  Accordingly,

the State is preliminarily enjoined from enforcing SEA 251 to terminate existing dues

deduction withholding agreements until after the 26th pay period of the 2020–2021 school

year.  The State is also enjoined from enforcing Indiana Code § 20-29-5-6(c)(3) as to all

new dues withholding authorization forms until further order of the Court.  The specific

language of the injunction will be set forth in a separate order as required by the Seventh

Circuit.

IT IS SO ORDERED.


Date: _____6/30/2021_____          _Sarah Evans Barker_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Courtney Lyn Abshire
INDIANA ATTORNEY GENERAL
courtney.abshire@atg.in.gov

Kelly Earls
INDIANA ATTORNEY GENERAL
kelly.earls@atg.in.gov

Sarah Ann Hurdle Shields
INDIANA ATTORNEY GENERAL
sarah.shields@atg.in.gov

Barry A. Macey
MACEY SWANSON AND ALLMAN
bmacey@maceylaw.com

Jeffrey A. Macey
MACEY SWANSON LLP
jmacey@maceylaw.com

Meredith McCutcheon
INDIANA ATTORNEY GENERAL
meredith.mccutcheon@atg.in.gov